FILED
2018 Jul-30 AM 10:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| MAYO WOODWARD, | ) |
| | ) |
| Plaintiff, | ) Case No. 2:16-cv-1801-KOB |
| | ) |
| v. | ) |
| | ) |
| BBT SECURITIES, LLC, | ) |
| MICHAEL OWEN, ET AL., | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM OPINION**

Before the court is Defendant BB&T Securities, LLC's Motion for Summary Judgment. (Doc. 28). Plaintiff Woodward asserts three counts against BB&T: 1) breach of his alleged employment contract; 2) breach of an implied covenant of good faith and fair dealing regarding the alleged employment contract; and 3) defamation. (Doc. 3).[1]

As more fully explained below, the court finds that Mr. Woodward was an at-will employee of BB&T. Therefore his first two claims regarding an alleged employment contract fail as a matter of law. The court also finds that the comments BB&T published regarding Mr. Woodward's employment performance were not false and defamatory. Therefore, the court will GRANT BB&T's motion for summary judgment as to all three counts.

---

[1] These claims represent Counts III, IV, and VII of Mr. Woodward's First Amended Complaint. He voluntarily dismissed Counts I, II, V, and VI on November 24, 2017. (Doc. 36).

## I. FACTUAL BACKGROUND

*Details Regarding Woodward's Position with BB&T*

Plaintiff Woodward is a Registered Financial Consultant who maintains Financial Industry Regulatory Authority licenses, as well as licenses to sell health and life insurance. (Doc. 29 at 5). Defendant BB&T manages securities for retail clients, and recruited Mr. Woodward to open and manage a BB&T Complex in Birmingham, Alabama. BB&T offered Mr. Woodward the position of Producing Branch Complex Manager through an offer letter on January 21, 2015.

The offer letter provided that Mr. Woodward's salary had two components: 1) a semi-monthly salary of $1,000, and a one-time bonus of $20,000 conditioned on his signing a Repayment Plan; and 2) a "declining semi-monthly guarantee non-recourse payment" for his first four years of employment. (Doc. 30-2 at 110). The letter then explained the guarantee non-recourse payment schedule and provided the yearly amounts that Mr. Woodward would receive.

Following the payment plan explanation, the offer letter provided that, beginning in January 2019, Mr. Woodward would no longer receive any "guaranteed" payment above his standard $24,000 annual salary. The letter explained that the incentives associated with Mr. Woodward's performance in developing the Birmingham market would offset the decline in his guarantees, but further cautioned that "[t]his guarantee is contingent upon [Mr. Woodward's] continued employment in the role of Producing Branch Complex Manager."

The letter also contained a merger clause, providing that "[t]his letter states our whole agreement with reference to your offer of employment…for only the position of Producing Branch Complex Manager." Finally, the letter contained the following warning: "If you accept this offer, please be aware that it is with the understanding that you will be employed at-will, which means that you may terminate your employment at any time and that BB&T may

terminate your employment at any time, for any reason not prohibited by applicable law." Mr. Woodward placed a check mark next to the statement reading "I accept the employment offer as set forth in this letter," and then signed and dated the letter.

After accepting BB&T's employment offer, Mr. Woodward and BB&T entered into a "New Hire Agreement" on January 28, 2015. (Doc. 30-2 at 113). The agreement contains a clause asserting that "[n]othing in this Agreement establishes an employment relationship other than one terminable at will by either of the parties." (*Id.* at 113–14). The very next paragraph states that "[Mr. Woodward] represents and declares that he has carefully read this Agreement and knows the contents thereof and that he signs the same freely and voluntarily." (*Id.* at 114).

After hiring Mr. Woodward, BB&T presented him with an employee handbook. The handbook stated that it was not a contract of employment, and under the heading "Employment Relationship," the first paragraph reads as follows:

> Your employment with the Corporation is an at-will employment. This means your employment may be terminated at any time with or without notice by the Corporation and you may quit your employment with the Corporation at any time. Nothing in this handbook should be considered to alter the at-will nature of your employment with the corporation.

(Doc. 30-1 at 68).

As Producing Branch Complex Manager, Mr. Woodward's "primary purpose" included "establishing direction, creating business plans with specific revenue and profit objectives, aligning associates, and providing motivation and inspiration in the execution of business plans." (Doc. 30-2 at 120). His "essential duties and responsibilities" included providing leadership to the Financial Advisors and staff employed at the Birmingham Complex by communicating "a clear vision of the future, acting as a positive role model, empowering staff to do their job,

influencing others, building trust, and presenting a positive and professional presence within the community." (Doc. 30-2 at 120).

***Complaints Regarding Mr. Woodward's Job Performance & Conduct***

During Mr. Woodward's employment with BB&T, several individuals lodged complaints regarding his work performance and conduct. Diann Fox, a Regional Associate Relations Manager at BB&T, recorded the complaints regarding Mr. Woodward in an investigation file, which she kept in the ordinary course of business. (Doc. 30-9).

On April 13, 2015, a BB&T employee named Caroline Dallas complained to Ms. Fox that Mr. Woodward made her feel uncomfortable. She alleged that he "encroached on her space, always ended up behind her desk looking over her shoulder, seemed to convey to clients that their working relationship was closer than it really was," and that she was "reluctant to communicate with him, because instead of returning a call, he always [came] to see her." (Doc. 30-9 at 6).

On June 15, 2016, Mr. Woodward's direct supervisor, Mike Owen, reported to Ms. Fox that he had found inaccuracies between Mr. Woodward's communications with one of his Financial Advisors versus what Mr. Woodward included in the Financial Advisor's performance review. Ms. Fox noted in her investigation file that while Mr. Woodward was an excellent recruiter, he did not "nurture the new [Financial Advisors] during their transition period" and appeared to never be in the office or to have sales meetings.

Ms. Fox's conversation with Mr. Owen prompted her to examine Mr. Woodward's performance reviews for the employees who reported to him. She found eight of his performance reviews contained deficiencies: six employee reviews were missing goals for 2015; another was missing goals for 2016; and one contained no goals at all. Of those seven reviews that did have

goals listed, the goals were too vague. Ms. Fox also testified that Mr. Woodward's ratings of BB&T Financial Advisors in his annual and 90-day reviews were inconsistent.

Ms. Fox then sent this information to Mr. Owen, and the two had a conversation about Mr. Woodward's job performance and his failure to sufficiently "onboard" his Financial Advisors. (Doc. 30-10 at 2). Mr. Owen decided to give Mr. Woodward a verbal warning the next time he saw him in Birmingham, which he believed would be after the July 4, 2016, holiday. Sometime shortly thereafter, Mr. Owen discussed with Mr. Woodward that he needed to do performance reviews, have sales meetings, and be in the office more. (Doc. 30-2 at 43).

Later the same month, a BB&T Wealth Manager named John Crawford introduced Mr. Woodward to a prospective BB&T client known to enjoy hunting. Mr. Woodward asked the prospective client if he hunted "the two legged variety or the four legged variety." (Doc. 30-10 at 3). Mr. Crawford complained to Mr. Owen about the comment, explaining that everyone understood that "the two-legged variety" referred to women. Mr. Owen counseled Mr. Woodward about this inappropriate behavior, and told him that his job would be in jeopardy if he continued such behavior. (Doc. 30-2 at 44).

In June or July of 2016, Mr. Woodward told one of his subordinates that she should reach out to a male recruit and leverage the recruit's attraction to her as a recruitment tool. (Docs. 30-2 at 45; 30-1 at 43). Mr. Crawford met with Mr. Woodward after this occurred, told him the comments were inappropriate, and asked Mr. Woodward to apologize to the Wealth Group office. (Doc. 30-2 at 46).

Finally, on August 22, 2016, Ms. Fox received yet another complaint about Mr. Woodward. (Doc. 30-9 at 4). The complaint was internal, but stemmed from a BB&T client's allegation that Mr. Woodward found a picture of the client's wife on Facebook, told the client

5

that his wife was "hot," and told the client that he wanted a "hot little number too." (Doc. 30-9 at 9–10). The client then told a BB&T Wealth Advisor that he never wanted to hear from Mr. Woodward again, and that he refused to do any business with him.

### *Mr. Woodward's Termination and Form U5*

Following this last incident, Mr. Owen consulted with his superiors and Human Resources regarding Mr. Woodward's future with BB&T. (Doc. 30-1 at 38–39). Then, Mr. Owen decided to terminate Mr. Woodward's employment because of the repeated incidents of inappropriate behavior described above. (*Id.* at 42). On approximately August 23, 2016, Mr. Owen spoke with Mr. Woodward about the incident regarding his alleged comments about the BB&T client's wife. (Doc. 30-2 at 46). Mr. Owen notified Mr. Woodward that he was terminating his employment during this conversation.

The Financial Industry Regulatory Authority regulates brokerage firms and brokers, including BB&T and Mr. Woodward. (Doc. 30-2 at 47–48). FINRA requires brokerage firms like BB&T to file a "Form U5" when it terminates a registered broker such as Mr. Woodward. Therefore, when BB&T terminated Mr. Woodward, it appropriately filed the form with FINRA. (Doc. 30-2 at 139–141).

The Form U5 provides two empty fields entitled "Reason for Termination" and "Termination Explanation." (*Id.* at 139). The latter contains the following instructions: "If the Reason for Termination . . . is Permitted to Resign, Discharged or Other, provide an explanation below." BB&T's Compliance Department was charged with choosing what language to place on Mr. Woodward's Form U5. Under "Reason for Termination," the department wrote "voluntary."

However, BB&T's Chief Compliance Officer consulted with Mr. Owen and BB&T's president regarding what should be written in the form's "Termination Explanation" field. (Doc.

30-1 at 50). They reasoned that their choices were either "unacceptable job performance/failure to perform job duties," or "inappropriate behavior." Ultimately, they, along with BB&T's Associate General Counsel, determined that "unacceptable job performance/failure to do job duties" was the best choice. Mr. Owen testified that they chose this explanation because they agreed that "the other alternative would have sounded a lot worse" for Mr. Woodward's reputation.

## II. STANDARD OF REVIEW

When a district court reviews a motion for summary judgment, it must determine two things: whether any genuine issues of material fact exist, and whether the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

The court must "view the evidence presented through the prism of the substantive evidentiary burden" to determine whether the non-moving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must not weigh the evidence and make credibility determinations because these decisions belong to a jury. *See id.* at 254.

Further, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). The court must grant the motion *only if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

### III. ANALYSIS

#### A. Woodward's Claim for Breach Employment Contract

Count III of Mr. Woodward's Complaint asserts that BB&T and Mr. Woodward entered into a binding contract guaranteeing Mr. Woodward at least four years of employment. (Doc. 3 at 4). Mr. Woodward further claims that BB&T breached that contract when it terminated his employment in August 2016—less than two years after hiring him.

Under Alabama law, "employment is terminable at will by either party for any reason unless there is an express and specific contract for lifetime employment or employment for a specific duration." *Ex parte Moulton*, 116 So. 3d 1119, 1136 (Ala. 2013) (internal quotation omitted). So, a presumption arises that an employee's employment status is "at-will." *Id.* To overcome this presumption, a plaintiff must demonstrate "(1) that there was a clear and unequivocal offer of lifetime employment or employment of definite duration; (2) that the hiring agent had authority to bind the principal to a permanent employment contract; and (3) that the employee provided substantial consideration for the contract separate from the services to be rendered." *Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725, 728 (Ala. 1987) (internal citations omitted). Absent these three elements, a plaintiff cannot establish that his employment is classified as anything other than at-will; he or his employer may terminate the relationship for "good reason, a wrong reason, or no reason." *Id.* (citing *Hinrichs v. Tranquilaire Hospital*, 352 So. 2d 1130 (Ala. 1977)).

Mr. Woodward argues that the offer letter's "guaranteed" payment to Mr. Woodward of four years base compensation creates an employment contract for a definite duration. He bases this argument on the following language within the letter: "[t]he first $2,000 per month [of Mr. Woodward's salary] will be considered a guaranteed draw against commissions earned in the

8

month paid;" that his compensation would include "a declining semi-monthly guarantee non-recourse payment for your first four (4) years of your employment," and that he would "no longer receive this additional guarantee payment" beginning in January 2019. (Doc. 30-2). However, a closer reading of the offer letter reveals Mr. Woodward's unreasonable interpretation.

First, the offer letter explicitly states that, if Mr. Woodward accepted the job offer, he would be considered an at-will employee. Second, a guarantee of payment and a guarantee of employment for a definite duration present two very different promises. Mr. Woodward's argument that one proves the other fails to persuade. Nothing about the guaranteed payment structure nullifies the letter's "at-will" language, nor does any reasonable interpretation of the offer letter create an employment contract of definite duration.

The court also considers other language in the offer letter: "This guarantee is *contingent upon* your continued employment in the role of Producing Branch Complex Manager." (Emphasis added). Quite obviously, the "guarantee" refers only to Mr. Woodward's payment structure. If the "guarantee" meant a guarantee of employment for a specific duration, the above condition would make Mr. Woodward's guaranteed employment contingent on Mr. Woodward's "continued employment." Such a condition is nonsensical.

The simple fact that BB&T was willing to commit to a certain payment structure does nothing to negate the offer's express language that, "[i]f you accept this offer, please be aware that it is with the understanding that you will be employed at-will, which means that you may terminate your employment at any time and that BB&T may terminate your employment at any time, for any reason not prohibited by applicable law." Guaranteeing an employee a certain payment structure for four years by no means makes a "clear and unequivocal" offer of

employment of a definite duration, especially when that guarantee is conditioned on the employee's continued employment with the company.

Thus, the court finds no way to reasonably interpret the offer letter as a contract guaranteeing Mr. Woodward four years of employment. He provided no evidence sufficient to overcome the presumption—and the clear language within the offer letter, the New Hire Agreement, and the Employee Handbook—that his employment was terminable at-will. Because no contract existed guaranteeing Mr. Woodward four years of employment with BB&T, Mr. Woodward's breach of contract claim fails as a matter of law. Consequently, the court will enter judgment in favor of BB&T on that claim.

**B. Woodward's Claim for Breach of Implied Covenant of Good Faith and Fair Dealing**

Count IV of Mr. Woodward's Amended Complaint alleges that BB&T breached an implied covenant of good faith and fair dealing within its employment contract with Mr. Woodward. (Doc. 3 at 6). In support of the claim, Mr. Woodward asserts that BB&T's termination of his employment "was wrongful, in bad faith, arbitrary and unfair." (*Id.*). He further argues in his brief in response to BB&T's motion for summary judgment that BB&T breached the implied covenant "by abruptly firing him for ostensible reasons that had nothing to do with his job performance" and before conducting his semi-annual employment review. (Doc. 33 at 13).

As previously stated, the court concludes that Mr. Woodward's employment with BB&T was at-will and the two parties did not enter into any employment contract. Without a contract, no implied covenant of good faith and fair dealing exists. *See, e.g., Williamson v. Wal-Mart Assocs., Inc.*, No. 1:11-CV-01405-HGD, 2013 WL 1909197, at *8 (N.D. Ala. Apr. 16, 2013) ("Before there can be a breach of a covenant of good faith and fair dealing, there must be an

employment contract upon which to base this covenant"), *report and recommendation adopted*, No. 1:11-CV-01405-WMA, 2013 WL 1909422 (N.D. Ala. May 6, 2013)).

Because Mr. Woodward's employment was at-will, BB&T could rightfully terminate his employment for "good reason, a wrong reason, or no reason." *Id.* (citing *Hinrichs v. Tranquilaire Hospital*, 352 So. 2d 1130 (Ala. 1977)). So, the court finds that, because BB&T and Mr. Woodward did not enter into any employment contract, no implied covenant of good faith and fair dealing existed regarding such contract. But even if such covenant did exist, BB&T submitted substantial evidence that it terminated Mr. Woodward for valid business reasons. Thus, even assuming BB&T owed Mr. Woodward a duty of good faith and fair dealing, BB&T did not breach that duty by terminating him because he repeatedly displayed offensive behavior. Consequently, BB&T is entitled to judgment as a matter of law regarding Count IV of Mr. Woodward's Amended Complaint.

### C. Woodward's Claim for Defamation

In Count VII of Mr. Woodward's Amended Complaint, he claims that BB&T defamed him by stating that he had been terminated for "unacceptable job performance/failure to perform job duties" on the FINRA Form U5. (Docs. 3 at 9; 33 at 14). Mr. Woodward contends this statement, and the statement that his termination was "voluntary," are false.

To establish a prima facie cause of action for defamation in Alabama, a plaintiff must show "1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement." *McCaig v. Talladega*

*Publ'g Co.*, 544 So. 2d 875, 877 (Ala. 1989). "Truth is an absolute defense to defamation." *Foley v. State Farm Fire & Cas. Ins. Co.*, 491 So. 2d 934, 937 (Ala. 1986).

### *Whether BB&T's Statements on the Form U5 Were False and Defamatory*

To begin, BB&T admits that it improperly stated on the Form U5 that Mr. Woodward's termination was "voluntary." BB&T maintains that entry was simply a mistake. Mr. Woodward provides no evidence to the contrary. More importantly, he provides no explanation of how the mistake defamed him.

Mr. Woodward also asserts that BB&T's explanation for his termination—"unacceptable job performance or failure to perform his job duties"—was false and defamatory because all of his performance reviews reflected that he was meeting or exceeding BBT's goals. However, BB&T produced a great deal of factual evidence regarding the complaints Mr. Owen and Ms. Fox received as to Mr. Woodward's inappropriate conduct. Mr. Woodward offered nothing to dispute that evidence. Nor did Mr. Woodward dispute BB&T's warnings that engaging in such conduct placed his employment in jeopardy. Perhaps Mr. Woodward's argument would hold water if BB&T relied solely on Mr. Woodward's performance reviews for stating that he had not adequately fulfilled his job duties, but BB&T has provided much more.

As Producing Branch Complex Manager, Mr. Woodward's "primary purpose" included "establishing direction, creating business plans with specific revenue and profit objectives, aligning associates, and providing motivation and inspiration in the execution of business plans." (Doc. 30-2 at 120). His "essential duties and responsibilities" included providing leadership to the Financial Advisors and staff employed at the Birmingham Complex by communicating "a clear vision of the future, acting as a positive role model, empowering staff to do their job,

influencing others, building trust, and presenting a positive and professional presence within the community." (Doc. 30-2 at 120).

Complaints regarding never being in the office, failing to conduct sales meetings, and behavior that could be viewed as sexual harassment certainly do not align with the purpose, duties, or responsibilities that BB&T assigned to Mr. Woodward's position. Mr. Woodward offered no evidence disputing these complaints and only affirmatively disputed one of the alleged instances of misconduct. Therefore, the court finds that BB&T's stated explanation for terminating Mr. Woodward is true.

Because Mr. Woodward's defamation claim fails as to the first element, and truth is an absolute defense to defamation, BB&T is entitled to judgment as a matter of law. The court will enter summary judgment in BB&T's favor as to Mr. Woodward's defamation claim.

## IV. CONCLUSION

For the foregoing reasons, the court finds that Mr. Woodward did not have an employment contract with BB&T, and his claims for breach of contract and breach of the implied covenant of good faith and fair dealing fail as a matter of law. The court also finds that his defamation claim fails because BB&T's stated reason for his termination was not defamatory, and its stated explanation for his termination was true. Therefore, the court will enter summary judgment in favor of BB&T.

**DONE** and **ORDERED** this 30th day of July, 2018.

*/s/ Karon O. Bowdre*
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE